In the Matter of JOHN HEISSENBUTTAL et al., Petitioners, against CHARLES ABRAMS, as State Rent Administrator, Respondent.

Supreme Court, Special Term, Kings County, May 26, 1955.

*Henry M. Feldschuh* for petitioners.

*Robert H. Schaffer* for respondent.

Di GIOVANNA, J.   This is an article 78 proceeding brought by tenants to review a determination of the State Rent Administrator, who reversed the findings of the local rent administrator and granted the landlord's application for a conditional certificate of eviction pursuant to section 54 of the State Rent and Eviction Regulations because tenants refused the landlord's workmen entry to their apartment.

On May 12, 1954, the respondent received landlord's " Application for Prior Opinion " with respect to contemplated improvements pursuant to paragraphs b and c of subdivision 1 of section 33 of the regulations.   In the application the landlord said:

The undersigned contemplates making the following improvements and is desirous of knowing what increase he will be entitled to receive upon completion of the following work:

1. Install a new heating system to be heated by oil.   Each room will have one or more radiators and each bathroom will have a riser.

2. Install a hot water system so that each of the tenants will have sufficient hot water.

3. Replace all old plumbing from the cellar to the top floor apartment in this building with new brass plumbing.   This building is approximately 40 years old and the plumbing should be replaced so as to give better service to the tenants.

4. Remove the high tanks and/or low-down tanks and install flushometers in each apartment.

Statement from plumber as to the cost of each of the above improvements is now on file in your office under No. AP 1519.

Notice of the landlord's " Application for Prior Opinion " was mailed to each of the twenty-five tenants on May 6, 1954. From a note on the progress sheet of the examiner dated May 28, 1954, it was reported:   " 21 tenants replied and state they do not want heat, hot water, etc."   The plumber's estimate dated June 29, 1953, detailed the prospective cost of supplying and installing labor and materials and itemized the installation of a heating boiler, an oil tank, and the oil burner, radiators and

piping necessary, and in the last paragraph on the first page said: "All above mentioned work is to be done in a good workmanlike manner, and all work is to be done in accordance with rules and regulations of Building Department, Fire Department and Smoke Control Bureau." On June 2, 1954, an "Order Granting Prior Opinion" was issued which stated, substantially, that if the major capital improvements provided in the application were completed a further application could be made by the landlord pursuant to subdivision 1 of section 33 for an increase in rent for each of the apartments; and it further set forth a specified rental increase for each apartment. It further said: "Tenant shall receive the increase in service of heat and hot water with a radiator in each room, a riser and new flushometer in bathroom. All old plumbing will be replaced with new brass plumbing, and further based upon conditions as set forth on reverse side." The conditions provide: "This order does not require the tenants to be removed from the housing accommodations during the progress of the contemplated work. Any threat or demand requiring any tenant in this building to remove from the premises should be immediately reported to the Local Rent Office indicated above."

Answers to the application for the order granting prior opinion were filed by many tenants, typical of which is one by Mrs. Regina Silk, wherein she said: "Reasons for my not wanting steam heat and hot water in my apt. are I am now paying $27.35 and an increase of $20 is beyond my means. My weekly salary would not cover my rent. The landlord is putting in heat but that will hardly compensate for the damp leaky walls in the rooms, cracked ceilings. Windows are so draughty, that no amount of heat would keep my apt. warm."

Mrs. Louis Urban wrote: "Have lived for the past 13 years in the same apartment, and am perfectly satisfied with conditions as they are. I cannot afford an increase and do not want steam heat." The proposed increase for her apartment was $14.75.

Despite similar objections made by twenty-one of these tenants, the order for prior opinion was granted on June 2d. These tenants were not then represented by counsel. On June 4, 1954, these tenants separately addressed letters to the respondent, attention of the head administrator, requesting further information and complaining of the hardships. Typical of these letters is one by a petitioner herein wherein she said: "Both my husband and I have constant medication to buy since operations a while ago. My husband also has ulcers and needs

constant care of doctors. This expense is terrific and an increase of rent would affect us considerably.'' The increase in this case was $25.25 per month.

Mrs. C. Hurley, facing a large increase, said: '' I have five rooms and bath and I am bringing up four children and this increase would be impossible for me to pay.''

Mrs. Mary Lippman said: '' I do not want to have steam heat and hot water installed in my apartment as I am a lone standing woman and have to work to support myself. I cannot afford a big rent as I earn $34 a week. My take-home pay is only $29. I also don't want this improvement as the apartment isn't worth the money I am paying for it right now. This landlord only takes rent and looks for increases but fixes nothing. My bathroom is all broken, the tile floor is all gone. The floor in my kitchen is caving in, walls are all peeling in the kitchen, living room and bedroom. My hot water boiler is leaking for the past two years which the landlord knows about but tells me that her lawyer advises her not to fix anything in the house. The window frames are all pulling away from the building and the windows are all cracked.''

Mrs. McCormick said: '' I live alone and cannot pay any more money.'' Mr. William E. Wendel said: '' I have one child and I could not afford to pay the rent as it would come to $57.05 a month.'' Other letters of similar import are in the file; as, for instance, a letter dated May 11th from Joseph G. Whelan, where he said: '' I can see much more needier now than steam heat, etc. For instance, the sidewalks in front of the house and the cellar could be taken care of along with other repairs which would be too numerous to mention here.''

The answers to the application and the letters of consternation after the issuance of the order present a picture of great hardship upon the tenants.

Nothing appears in the record to show that any of the proposed plans for addition of the central heating system in this building conformed to the building laws of this State, or to the requirements of the fire department or other appropriate municipal bureaus. Complaints of the tenants as to defective conditions in these premises, aside and apart from the heating situation, were most numerous and yet nothing in the order granting prior opinion indicated that any consideration was given to those complaints. Ordinarily, these complaints, if found by the respondent to be true, would have justified a decrease in rent,

The landlord had his plumber go into the premises and commence construction of the central heating system in the basement but when he sought access to the tenants' apartments, entry was refused. An application was then made by the landlord pursuant to section 54 of the regulations for permission to enter the apartments, and on December 10, 1954, it was denied by an order stating: "The requested removal or eviction is inconsistent with the purposes of the Act and the Rent and Eviction Regulations and would be likely to result in the circumvention or evasion thereof."

Significant herein are the summary and findings written by the examiner, M. Robinson, December 8, 1954, wherein he said: "On June 2, 1954 in Docket Nos. AP-1718-1742, Orders Granting Prior Opinions were issued, stating that certain specified increases in rental would be granted for each of the 25 apts. in said building if and when L [landlord] installed certain improvements [heat, hot water, etc.] therein and made application therefor. Landlord now seeks C-Es against 8 of these tenants under Section 54 of the R & ER, alleging that they refuse access to L to permit the installation. L originally claimed that all of these 8 tenants are willing to cooperate with L. L now admits that at least 17 of the 25 tenants vigorously object for reasons above stated." He then posed the question: "Is the requested eviction in each case inconsistent with the Act and R & ER etc.?" and he recommended: "In effect, landlord seeks to place this Commission in the position of compelling unwilling tenants either to accept unwanted improvements with corresponding unwanted increases in rent or to vacate. I find it improper to have this Commission be forced to take a stand with respect to either alternative. The Prior Opinion orders are permissive in nature: If landlord makes the improvements landlord would be entitled to an increase. There is no obligation, legal or otherwise, for landlord to do so. There are no violations on the premises. I find that to coerce the tenants is inconsistent with the purposes of the Act and of the R & ER and would be likely to result in circumvention or evasion thereof. I recommend denial." Noted in the statements of the respective parties present at the conference resulting in the above finding is a statement: "3. Despite repeated requests by the tenants, landlord has failed to make necessary repairs: The public hallways are dirty, need cleaning and painting. The windows are in disrepair, etc., etc."

The landlord's statement contains the following: "Landlord is willing to consider raising T's rents at lesser amounts than

proposed in the LRO Opinion orders but all Ts refused to consider it. Landlord admits there are no violations affecting the premises.'' Many of the tenants filed letters which are in the record in this case in which the attention of the respondent was directed to the otherwise unsatisfactory maintenance of these premises. Indeed in a letter from John Tommasulo received December 1, 1954, he said: '' Indeed I agree with Commissioner McGoldrick that the house be rehabilitated. I wish that he would inspect this building personally and see the necessary repairs that are undone before allowing this landlord * * * to start an improvement that is neither necessary to the tenants nor required by law to be done.''

Each of the tenants indicate in their letters that insofar as their respective apartments are concerned they themselves have done all work necessary to keep the apartments in a clean and orderly condition and make it affirmatively appear that the common portions of the building were in a most neglected condition. The landlord brought a proceeding against these tenants in the Magistrate's Court to compel them to permit entry to the apartment. That proceeding was dismissed after trial. A protest was then taken to the State Administrator who reversed the findings of the examiner and said: '' These orders were issued on June 2, 1954 and the tenants did not protest against them. The Administrator is therefore of the opinion that the landlord has at present a right of access to the apartments in order to have the work done and that it is unreasonable for the tenants to refuse the landlord access for such purpose. While ordinarily an improvement may not be added without the tenants' consent, there are exceptions where such consent of the tenants is not required. If the improvement is reasonably required for the operation of the structure, for example, if the landlord wishes to convert from a cold water flat to a steam heating one, he has a right of ownership and it is not reasonable to say to the owner that he must permit his property to be slum property forever.''

It is quite apparent that when the State Administrator said '' The tenants did not protest,'' he did not pay heed to the numerous letters in the file which definitely protested against the orders. It may be true that the tenants, who were not then represented by counsel, did not use the forms required by respondent's regulations but, nevertheless, protests they were. The Administrator further said that in his opinion '' the landlord has at present a right of access ''. There is no doubt that he had no such right of access during all of the period of time

that the tenants refused to permit him in. When did this right of access come into being? What caused this nonexisting claim to a right to ripen into a right? These tenants were satisfied to live in these apartments without the benefit of steam heat and to heat the apartments in their own way. The landlord rented these apartments to these tenants with those conditions present. These tenants could not afford to pay more rent, otherwise they would not have moved into such apartments. No violations existed against this house, so the landlord claimed. Obviously, as far as the municipal departments were concerned, this was not a dilapidated building. While having steam heat may be a convenience without which many people could not live, nevertheless it may be recognized that there are people among low income groups who cannot afford that luxury. The State Residential Rent Law was intended to protect those people as well as the ones who could afford to pay higher rents. It is significant to note that the question is raised in this application as to whether the State Rent Administrator had the power in the first instance to render such an order of prior opinion as he rendered in this case. Section 117 of the State Rent and Eviction Regulations reads: " 1. Official interpretations of general applicability with respect to the provisions of the Act or these Regulations shall be issued only by the Administrator. No interpretation shall be given in response to any hypothetical question. 2. Any person desiring an opinion as to the applicability of the Act or these Regulations to a specific factual situation, shall make a request in writing for such opinion to the Local Rent Administrator for the locality within which the housing accommodations involved are situated. * * * No opinion shall be given in response to any hypothetical question."

Section 33 says: " This section sets forth specific standards for the increase of maximum rents. In applying these standards and entering orders adjusting maximum rents, the Administrator shall take into consideration all factors bearing on the equities involved, subject to the general limitation that the adjustment can be put into effect without dislocation and hardship inconsistent with the purposes of the Act. * * * Any landlord may file an application to increase the maximum rent otherwise allowable, on forms prescribed by the Administrator, only on one or more of the following grounds:" (We are concerned here only with the grounds stated in the instant application.) " b. there *has been* since March 1, 1950 an increase in the rental value of the housing accommodations as a result of a

substantial rehabilitation of the building or housing accommodations therein which materially adds to the value of the property or appreciably prolongs its life, excluding ordinary repairs, maintenance and replacements; or c. there *has been* since March 1, 1950 a major capital improvement required for the operation, preservation or maintenance of the structure ''. (Italics supplied.)

When this landlord submitted an application for an opinion based upon the hypothesis resulting from a contemplated or future installation of a central heating system which had never been in the building before, he asked for an opinion based upon a hypothetical situation. There was no proof submitted that the plans or the estimates conformed to the existing laws or that the $19,000 estimated price was inclusive. The items left out of the plumber's estimate, such as fire retarding required in oil burner installations, might very well increase the estimated cost and the final cost to an amount which would increase the rent of these tenants far beyond the amounts set forth in the order. Nevertheless the order granting prior opinion was made. *Nothing contained in section 33 gave the respondent any right to base an opinion upon contemplated or projected major improvements but only upon executed major improvements.* The mere fact that the order says that, after completion of the contemplated improvements, a further application would be made, did not sanction the granting of such prior opinion under these circumstances.

Furthermore, assuming respondent had a right to render an opinion, such opinion was ineffectual for any other purpose but to guide the landlord in his future plans. As long as the prior opinion continued to be treated only as a prior opinion, no harm could come therefrom. But when the respondent put teeth into it by giving directions to tenants not contemplated in the application for prior opinion, in effect by putting into the hands of the landlord a weapon to compel the tenants to permit the landlord to do the work, the prior opinion no longer was merely advisory but became an order of the respondent not provided for by law.

It is questionable, too, whether the installation of a central heating system constituted a substantial rehabilitation of the building. Steam heat, though a great convenience, is not essential to fine living. Rehabilitation means, effectively, a reconstruction of the building rather than addition to the services therein contained, and includes extraordinary repairs to the structural parts of the building and extraordinary requirements for maintenance and replacements. Therefore the opinion with

respect to subdivision b is of no value. Similarly, with respect to c, there is nothing to indicate that the installation of the central heating system was required for the preservation or maintenance of the structure. There are many devices which can be safely used for heating in each of the apartments, and under the circumstances there is insufficient proof that the proposed installation constituted a major capital improvement within the meaning of the State Rent and Eviction Regulations.

It would appear that when the respondent passed upon the sufficiency of the plans submitted to him, he passed upon matters which were peculiarly within the supervision and control of the building department of the City of New York, the fire department of the City of New York and the health department. In a pamphlet issued June 5, 1950 (Advisory Bulletin No. 6), the respondent itself said that structural defects and health hazards should be reported to those various departments. Some mention has been made in the briefs concerning the deplorable housing conditions existing in slum areas. Assuming that the house in question fell in that category, nevertheless it was not within the jurisdiction of the respondent to remedy those defects except to reduce rents. Moreover, it is undisputed that no violations existed against this building. Therefore the reference to this as a dilapidated, deteriorated slum building would appear to be contrary to the landlord's own statements. The emergency rent laws were passed to prevent inequitable raises in rent for all people, and cannot be used in the manner outlined herein without regard to the rights of tenants housed within the building. Where a substantial demolition and reconstruction of the building is about to be made, even in such instance the law required a relocation of the tenants by the landlord, at the landlord's expense, in a comparable housing unit.

In its brief, the respondent said: " It is noted that the use of ' side-arm ' water heaters, which are presently used by the tenants in the building, is frowned upon by the municipal authorities of the City of New York. Furthermore, in view of the liability provisions of the Multiple Dwelling Law, the landlord may be subject to serious personal liability if such water heaters are continued to be used in her building."

It is quite apparent that in adopting that argument the respondent sought by administrative fiat to legislate against the use of " side-arm " water heaters. It is of interest to note that chapter 682 of the Laws of 1955 bore the following legislative note (Assembly Introductory No. 1539; Assembly Print Nos. 1567, 2234, 3854): " This bill will bring about greatly

needed improvements in safety and fire protection for inhabitants of multiple dwellings. Many deaths and injuries will be prevented by enactment and enforcement of these added requirements, particularly in the case of oil burning equipment for heating or cooking. In many instances, defective design or installation of this equipment has caused the deaths of entire families. Many people advocate the outright banning of this type of equipment but the Committee believes that such would be too drastic at this time particularly because of the fact that central heating or other similar systems would be necessary in such event, and is of the opinion that this progressive and interim approach is the only realistic and practical solution at the present time.''

The bill, enacted as section 64 of the Multiple Dwelling Law, permits the continued use of side-arm water heaters, provided they are vented or otherwise protected as set forth in the statute by June 30, 1956.

Obviously, rehabilitation of old type side-arm water heaters would be a major rehabilitation of an existing building as distinguished from the compulsory installation of a central heating system, the compulsory installation of which the Legislature has rejected. Without any accurate knowledge of the difference in cost with respect to each type of installation, it is nevertheless quite apparent that the installation proposed in chapter 682 is much less expensive than that proposed by the landlord herein and would certainly entail a much smaller increase in rent to these indigent families.

For the reasons set forth above, this court is of the opinion that the order of the State Rent Administrator is null and void because respondent had no right in the first instance to render an order granting prior opinion in this case.

The court is of the opinion that notwithstanding the worthy motives of the Administrator, nevertheless this action was arbitrary and capricious under the circumstances.

Submit order.